IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
March 4, 2014 Session

**STATE OF TENNESSEE v. SUSAN M. BARNETT**

**Appeal from the Circuit Court for Gibson County**
**No. 17702    Clayburn Peeples, Judge**

---

**No. W2013-00697-CCA-R3-CD  - Filed May 30, 2014**

---

A Gibson County jury found the Defendant, Susan M. Barnett, guilty of one count of aggravated assault, two counts of assault, and one count of unauthorized use of an automobile.  The trial court ordered the Defendant to serve a six-year sentence for the aggravated assault conviction and concurrent sentences of eleven months and twenty-nine days for the remaining convictions.  On appeal, the Defendant claims that the evidence is insufficient to sustain her conviction for aggravated assault by seriously bodily injury because the victim did not suffer "seriously bodily injury."  After a thorough review of the record and applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and ROGER A. PAGE, JJ., joined.

Andrea Sipes Lester and Chad M. Butler (on appeal), Gregory W. Winton and J. Daniel Rogers (at trial), Jackson, Tennessee, for the appellant, Susan M. Barnett.

Robert E. Cooper, Jr., Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Garry G. Brown, District Attorney General; Stephanie Hale and Jerald Campbell, Assistant District Attorneys General, for the appellee, State of Tennessee

**OPINION**
**I. Facts**

This case arises from the assault of Tina Lowry, the victim.  For her role in this crime, a Gibson County grand jury indicted the Defendant for one count of especially aggravated kidnapping, two counts of aggravated assault, one count of assault, and one count of theft of

property exceeding $1,000.00. At trial, the parties presented the following evidence: The victim testified that she lived with her mother and stepfather at the time of trial and had been living there since she moved out of the Defendant's home in the fall of 2006. The victim stated that she was in a relationship with the Defendant for three to four months in 2006, but they had since ended the relationship. The victim testified that it was not an amicable break-up, and she stated that she had left the Defendant. The victim stated that she and the Defendant were having problems, so the victim moved out of the Defendant's home without telling her. The victim stated that, between the fall of 2006 and January 2007, she had little or no contact with the Defendant, who would sometimes call her even though they were not together at that time.

The victim stated that on January 10, 2007, the Defendant called her several times to ask the victim to take her to the grocery store. The victim obliged, and after buying groceries she and the Defendant went to an establishment called O'Brien's to "shoot pool." The victim recalled seeing her uncle, Marshall Buchanan, at O'Brien's that day, and she visited with him. The victim stated that "everybody" was drinking, including herself and the Defendant. The victim recalled meeting Sara Schwantz and Jim Lins at O'Brien's. The victim and the Defendant remained at O'Brien's until closing time, and then the victim, her uncle, and the Defendant got into the victim's car and went to a gas station to buy beer. After leaving the gas station, the group proceeded to the home of Ms. Schwantz and Mr. Lins.

The victim recalled having a couple of drinks at the Schwantz/Lins residence, and she continued to talk with her uncle and played a game of pool with him. At some point, the victim's uncle left, and Ms. Schwantz, Mr. Lins, the victim, and the Defendant all gathered around the pool table to play "partners pool." The victim recalled that she bent over the table to "take the shot to break" when she was "gotten around the neck and pulled down to the floor" by the Defendant. The victim said the Defendant dragged her by her hair across the floor and turned the victim over and hit her repeatedly in the face. The victim said that, at some point, she lost consciousness, and "when [she] came to [she] was handcuffed to a chair beside the pool table." The victim recalled "being got around the neck by something" and being asphyxiated while in the chair. The victim asked to be released, and the Defendant started beating her in the face again. The victim stated that she was handcuffed to the chair for at least three hours or longer and that she urinated on herself during that time. The victim recalled that she was choked with "something soft" and that it was pulled tighter and tighter around her neck until she would pass out.

The victim recalled regaining consciousness at one point and seeing Ms. Schwantz and Mr. Lins in the living room. She asked them to release her, and "they all started laughing." The victim stated that her eyes were badly swollen and that the Defendant stood behind her and tied knots in her hair. The victim stated she was hit in the face with a hard

object some of the time and with fists at other times. She described her pain level as a "Ten."

The victim testified that she asked repeatedly to be let go, and she could tell Ms. Schwantz was "frightened" about what had occurred. Ms. Schwantz told the Defendant to let the victim go home. At this point, the Defendant came up behind the victim, still handcuffed to the chair, and kicked the chair over causing the right side of the victim's face to hit the floor. The victim said, "then [the Defendant] got on top of me with me down on the floor, released the handcuffs, tied some more knots in my hair and was jumping up and down on my back about two or three times, [and then] jerked me up." The victim testified that she could not walk and was helped to a couch. The Defendant said, "Come on let's get her out of here," and put the victim in her truck. The victim said the Defendant slammed the car door on the victim's ankle. The victim asked to be taken home, but the Defendant took her to Danny Hensley's house, whom the victim knew. The victim stated that it was "daylight" by the time they reached Mr. Hensley's house. The Defendant "bragged" to Mr. Hensley about what had happened at the Schwantz/Lins residence that night, saying that she had beaten the victim. The victim stated that she was scared for her life and in shock. The victim asked to use the restroom at Mr. Hensley's house, but the Defendant said she could not.

The victim testified that there were "other acts of assault" at Mr. Hensley's residence. After the victim used the restroom, the Defendant told the victim they were leaving, to which the victim replied, "I am not going anywhere with you." At that point, the Defendant "came at" the victim and "got [her] down on the floor." The Defendant pulled out a knife and put it to the victim's throat and said, "B***h, I said get in the truck and get in the truck now." The victim replied, "You're going to have to kill me here because I'm not going anywhere with you." The victim testified that Mr. Hensley "intervened" at that point, and "kicked" the Defendant off the victim. The victim recalled that the knife went flying, and Mr. Hensley and the Defendant engaged in an "altercation" during which Mr. Hensley "basically kicked [the Defendant] out the door and that's when she took my truck and left." The victim estimated the value of her truck as between $1,000 and $1,500. The victim testified that Mr. Hensley called the victim's mother, who came to pick her up. They drove home so the victim could go to the bathroom and change clothes, and then they drove to the Dyer Police Department.

The victim stated that photographs of her injuries were taken at the police department. The victim identified the photographs, and the photographs were admitted as evidence. The photographs showed marks on the victim's wrists from the handcuffs and the injuries to her face and chin. The victim testified that she sustained a fractured nose and injuries to her eye that had never fully healed. She testified that the level "ten" pain lasted one month and that she could get out of bed only to go to the bathroom. She testified that she was prescribed

Xanax for anxiety and hydrocodone for pain and that it was approximately two months before her physical pain subsided. The victim stated that she started getting migraine headaches after the incident, which she had not had before.

On cross-examination, the victim agreed that she did not pursue charges against anyone other than the Defendant, particularly Ms. Schwantz and Mr. Lins, because she did not see them hitting her. The victim agreed that she and the Defendant had smoked marijuana at the Defendant's house before they went to buy groceries. The victim recalled that she had four or five beers at O'Brien's and two or three drinks at the Schwantz/Lins residence. She denied having taken Xanax that day.

The victim recalled that she drove away from O'Brien's to the gas station and then to the Schwantz/Lins residence. She stated that she had no idea how the incident at the residence started that night. She stated that she "knew it was [the Defendant] that got me from around the neck. [Ms. Schwantz] and [Mr. Lins] were on the opposite side of the table."

The victim agreed that she had been convicted of obstruction of service of process in 2004. The victim stated that the "only joint" that was smoked that night was at the Defendant's house before they went to the grocery store, and no drugs were used at the Schwantz/Lins residence. The victim agreed that, shortly after the incident, she filed for an order of protection against the Defendant. She agreed that some of the details she had written in the petition for an order of protection were different from what she testified to at trial, particularly that the petition did not state that it was the Defendant who had beaten her. She agreed that she gave statements to the police.

The victim denied being aggressive or belligerent at the Schwantz/Lins residence, and she denied getting jealous of the Defendant and Ms. Schwantz or attacking the Defendant. She denied being intoxicated the next morning, or acting belligerently towards the nurses at the hospital. The victim stated that she "never" provoked the Defendant that night and stated that the Defendant was jealous and getting revenge on her for moving out. The victim agreed that, at the preliminary hearing, she had testified that she did not know how the incident started. The victim agreed that she did not see the Defendant put the handcuffs on her.

The victim denied that it had been the Defendant who broke up with her. The victim agreed that she had a beer at Mr. Hensley's house because he did not have running water at the time and because there was nothing else to drink in the house. The victim recalled that, when she and the Defendant arrived at Mr. Hensley's, the victim had to be helped out of the truck by the Defendant and into the house. She stated that, walking up the stairs to his house, the Defendant let go of her and she fell and hit her face on the steps. The victim denied that

she fell due to intoxication.

The victim testified that her black eyes lasted for several months and that she suffered migraine headaches once or twice a month after the incident. The victim stated that, while handcuffed to the chair, she "possibly" was hit with a pool ball in a sock, but she recalled that she was "hit with something harder than a fist" for part of the time she was handcuffed, and part of the time she was hit with the Defendant's fist. She stated that she "didn't see" herself get hit with a pool ball in a sock. The victim stated that, when she gave initial statements to police, she was in shock and "traumatized" and wanted to go home.

The victim's uncle, Marshall Buchanan, testified that he was at O'Brien's on the night of January 10, 2007. He stated that he arrived there at 9:00 p.m., and he recalled the victim and the Defendant being there together. He testified that they left O'Brien's at 10:30 p.m. as a group, drove to a gas sation, and then drove to the Schwantz/Lins residence. Mr. Buchanan said he left the residence that night at 11:50 p.m. and said "bye" to the victim, but he did not think she heard him. When he left, the victim and Mr. Lins were playing pool. He stated that the victim was "able to handle herself playing pool" and was "doing fine." He denied that there was any fighting between the Defendant and the victim, and he said that, when he left, "everyone was just having a good time."

On cross-examination, Mr. Buchanan said that the victim drank two or three beers at O'Brien's and one at the Schwantz/Lins residence. He recalled that present at the residence were himself, the victim, the Defendant, the "couple that lived there," and their son, who was upstairs. He reiterated that there was no fighting, arguing, or altercation of any kind while he was at the house that night.

Daniel Hensley testified that he was familiar with the Defendant and that she and the victim came to his house on the morning of January 11, 2007. Mr. Hensley said he had been drinking the night before, had "popped" a couple of Xanax pills, and gone to sleep. He awoke to beating and banging on his front door, and, when he answered it, the Defendant came inside and "was trying to tell [him] about what all happened, but at the same time [the victim come] right after her and [the victim] had to go use the bathroom and then [the victim saw] her face" in the mirror. Mr. Hensley recalled saying, "Goodness, girl. What happened to you?" Ms. Hensley said he was trying to get the two women out of his home because they were arguing, and he "finally got [them] to leave[.]"

After a jury out hearing to declare Mr. Hensley a hostile witness, he testified that when the victim came inside his house she was able to walk on her own. He agreed that she was injured and that there was "some" discussion that the victim had been beaten. He disagreed that the Defendant was "bragging" about the beating, but he said she was trying

to tell him what happened. Mr. Hensley testified that he was trying to get the women out of his house but that the victim "didn't want to leave with [the Defendant] because she was scared to death of [the Defendant.]"

Mr. Hensley agreed that he later spoke with law enforcement officers and told them what happened. He agreed that he would not have lied to the officers.

On cross-examination, Mr. Hensley agreed that he was groggy and confused when the victim and the Defendant arrived at his house. He testified that a knife and a cellular telephone fell out of the Defendant's bra onto the floor of his house. He testified that he lived in a single-wide trailer, with cinder block steps leading up to it. Mr. Hensley stated that his dogs had ripped out the plumbing in the past, so it was possible that the trailer did not have running water that day.

Mr. Hensley recalled that the Defendant came inside his house first, and the victim, who had been inside the truck, followed a "few minutes" later. He recalled that the victim fell when she came inside and that she "seemed like she was messed up." He stated that ,when the victim saw herself in the mirror, she became upset and started yelling at the Defendant. He denied that the victim became belligerent or aggressive. Mr. Hensley said the two women were arguing, but he did not recall the victim "begging for her life . . . ." He said that the victim's mother came and picked her up after the Defendant had left. He agreed that he had seen the victim intoxicated before but not "belligerent" or "aggressive[.]"

On redirect-examination, Mr. Hensley stated that he had known both women for approximately twenty years and that he was friends with them. He recalled the Defendant telling him about "some kind of pool" game and that was when the victim came inside and saw herself in the mirror. Mr. Hensley was shown a picture of the victim's injuries that had been admitted into evidence, and he agreed that the pictures depicted how the victim looked when she arrived at his house that day. Mr. Hensley agreed that, once he saw the victim's injuries, he "woke [] up a little bit[,]" and he agreed that he fought with the Defendant and that was when the knife fell out of her bra.

Investigator Steve Webb testified that he worked for the Gibson County Sheriff's Department on January 11, 2007, and that he reported to the emergency room at 8 a.m. that morning, where he saw the victim. Investigator Webb was shown the photographs of the victim's injuries, and he agreed that the photograph accurately depicted how she looked on that day. Investigator Webb testified that he spoke with Mr. Hensley, stating:

> Mr. Hensley stated that [the victim] and [the Defendant] had showed up at his residence . . . in the early morning hours; they were intoxicated and that [the

Defendant] had been fighting with [the victim] at his residence and had pulled a knife on [the victim] at his residence, and that [the Defendant] was trying to get [the victim] to leave with her and [the victim] did not want to leave and at that time [the Defendant] left in [the victim's] vehicle.

Investigator Webb testified that he spoke with the Defendant on January 11 and that she signed a *Miranda* form indicating that she understood her rights. He testified that she gave a written statement, dated January 11, 2007, which read: "I, [the Defendant] went with [the victim] to [O'Brien's] at 7 p.m. after taking my daughter to the grocery store. We stayed in the bar 'til last call, at which time I no longer had relations with [the victim]."

On cross-examination, Investigator Webb testified that he interviewed the victim twice, once at the hospital and then a day or two later. He stated that the statement he received from her at the hospital was written by the victim's mother because she "could not write at that time." He recalled that the victim told her mother what to write. The victim's statement, which was admitted into the record as evidence, read as follows:

> When we left Trenton, we went to Danny [Hensley's] house. [The Defendant] drove my truck, we were alone. At [Mr. Hensley's] we talked and had a beer. [The Defendant] was still mad from the [Schwantz/Lins residence] where I had been bond [sic] and beat. [The Defendant] was trying to get me to leave [Mr. Hensley's] house. I refused and [the Defendant] drug me around by my hair in [the] trailer. [Mr. Hensley] got between then would not allow [the Defendant] to take [me] from his house. [The Defendant] then stole [my] Toyota truck and left. [The Defendant] said she would kill me several times while we were there. [Mr. Hensley] saved me from further bodily harm.

Investigator Webb testified that the victim appeared to be intoxicated, as indicated by "an odor of intoxicant about her person." He stated that the victim's movements were "unbalanced," and her speech was slurred. He did not recall the victim being uncooperative with the nurses.

Investigator Webb testified that the victim said she had been assaulted at Mr. Hensley's home and that she had consumed a beer there. Investigator Webb agreed that he examined the Defendant's hands when he interviewed her, and she had minor scratches and scabs around her knuckles, her fingers, and the top of her hand. Investigator Webb agreed that Mr. Hensley told him that a knife had been held to the victim's throat, and he indicated that the women's argument started at his home and happened because the Defendant wanted to leave and the victim did not want to leave with her.

On redirect-examination, Investigator Webb agreed that it was possible that the victim's speech was slurred because her face was swollen and disfigured from the beating. He recalled that the victim could not write her own statement because her eyes were "pretty well swelled shut." Investigator Webb agreed that his jurisdictional limitations allowed him to investigate only the events that occurred at Mr. Hensley's home and not at the Schwantz/Lins residence.

Norma Gordon testified that she was the victim's mother and that her daughter had moved in with her after the "accident." Ms. Gordon stated that she knew the Defendant, and she knew the victim was in a relationship with the Defendant at some point. She stated that the couple had a "less than amicable breakup" and that the Defendant had called Ms. Gordon at work and threatened physical violence against the victim.

Ms. Gordon testified that she saw the victim on January 10, 2007. She testified that she received a call at 6:00 a.m. on January 11, asking her to pick up the victim at Mr. Hensley's home. Ms. Gordon agreed that the photographs entered into evidence were an accurate depiction of the victim's injuries. She agreed that she observed injuries to the victim's wrists. Ms. Gordon testified that the victim's bruises remained visible for several months and that she was "told to watch for brain swelling[.]" Ms. Gordon stated that the victim was still suffering from side effects of the injuries to her face at the time of trial.

On cross-examination, Ms. Gordon stated that the victim was employed until a "couple of weeks" before she moved in with the Defendant. She denied that the victim had any problems with drugs or alcohol at the time of the incident. Ms. Gordon agreed that she did not like the Defendant and did not like the victim's being in a relationship with her. She stated that she did not know the Defendant prior to the incident.

Sara Schwantz testified that she lived with Mr. Lins in 2007, along with her seventeen-year-old son. She stated that, at the time of the incident, she had known the Defendant approximately one month and was not familiar with the victim. Ms. Schwantz testified that she went to O'Brien's with Mr. Lins on the night of January 10, and that she saw the Defendant and the victim together there. Ms. Schwantz stated that, after O'Brien's closed, the Defendant and the victim called to ask if they could come to the Schwantz/Lins residence. She agreed that the Defendant, the victim, and Mr. Buchanan came to her home and that there was a pool room in the home.

Ms. Schwantz testified that she "really [didn't] know how everything transpired[,]" but she saw the Defendant hitting the victim and told them they needed to leave. She stated that the victim was intoxicated, was "swaying," and would not sit down. Ms. Schwantz stated that she did not see the beginning of the altercation between the Defendant and the

victim. She testified that she saw the Defendant hitting the victim with her fists, but she could not recall how many times the Defendant hit the victim or how long the incident went on. Ms. Schwantz stated that, when the hitting was occurring, the victim did not look like she did in the photographs taken later of her injuries. She stated that she did not see anyone other than the Defendant strike the victim. Ms. Schwantz said that, when she came into the room and saw the Defendant hitting the victim, Ms. Schwantz asked the Defendant to stop and pulled her off the victim. She agreed that the victim had "marks" on her, but she maintained she did not look like she did in the photographs in evidence.

On cross-examination, Ms. Schwantz testified that she concluded the victim was drunk because she was not standing up straight and "bouncing off the walls[.]" Ms. Schwantz testified that she tried to help the victim into a chair, so she would not hurt herself, and then Ms. Schwantz went "back into [her] bedroom." When she returned to the room, the "fight" between the Defendant and the victim was going on. She denied that the Defendant was hitting the victim with anything but her fists. She denied that the victim was handcuffed to a chair or restrained in any way. Ms. Schwantz recalled that "someone else" named "Sara" was at her home that night playing pool with everybody else. She recalled that the people in her home were drinking beer and "Sambuca" that night.

Ms. Schwantz testified that she asked the Defendant and the victim to leave, and then she went back into her bedroom again and closed the door. She stated that the victim appeared to leave the home willingly.

On redirect-examination, Ms. Schwantz agreed that she and Mr. Lins had been reluctant to get involved in the trial. She denied seeing the victim "fall on her face." She agreed that she saw the victim playing pool and denied seeing the victim get "belligerent" or fighting with anybody. She stated that she did not know if the victim drank anything while at her home. Ms. Schwantz reiterated that the people at her home that night were herself, Mr. Lins, the victim, the Defendant, and Mr. Buchanan. She had "no idea" who the other person named "Sara" was or if she was in the home that night.

Marty Burke testified that he was an investigator for the Public Defender's office and investigated the events that led to this trial. He stated that his office was appointed to represent the Defendant. He stated that he had a telephone conversation with the victim, during which she stated that she had been beaten with a pool ball in a sock.

Sara Medlin testified that she was familiar with the Defendant but not with the victim. She recalled being at the Schwantz/Lins residence one night, but she could not remember the date. Ms. Medlin said she was there shooting pool with the Defendant and that Ms. Schwantz, Mr. Lins, and "Prissy" were also there. She clarified that "Prissy" was the victim.

She stated that the group was drinking and that they had been at O'Brien's earlier that night. She stated that "they" were "kicked out" of O'Brien's that night because the victim was "starting fights" and was "very much" intoxicated. She stated that the victim was "falling down," but she could not recall the victim falling into furniture or onto the floor. Ms. Medlin described the victim as belligerent and unable to "handle herself."

Ms. Medlin testified that the victim was aggressive toward other people at the bar and later toward her and the Defendant because Ms. Medlin was "hitting on" the Defendant at the Schwantz/Lins residence. Ms. Medlin testified that, at some point, an "altercation" occurred between the victim and the Defendant and that "they did fight." Ms. Medlin could not remember who threw the "first punch" but stated that she pulled the Defendant off the victim, and then the victim grabbed the Defendant by the hair and started fighting again. She stated that the two women were still fighting when she left. She denied seeing the victim handcuffed or beaten with a weapon of any kind.

On cross-examination, Ms. Medlin testified that "Sara" invited her to come shoot pool at her house, meaning the person whose "house we was at." Ms. Medlin said she had met Ms. Schwantz two or three times, but she had never met Mr. Lins or the victim. She stated that she and the Defendant had been friends for several years. Ms. Medlin said that the victim "fell out" at the bar, and fell off a bar stool, but Ms. Medlin denied that the victim hit her face when she fell. She stated that, when the victim and the Defendant were fighting, Ms. Medlin tried to "break them up twice," but the victim "kept coming back." Ms. Medlin stated that, when she left the Schwantz/Lins residence, the victim did not look like she did in the photographs.

On redirect-examination, Ms. Medlin agreed that when she saw the victim at the house, the victim was "beat up." Ms. Medlin stated the victim "was getting the worst end" of the fight, but Ms. Medlin did not "remember her head looking like that." She agreed that the victim's face was swollen.

On recross-examination, Ms. Medlin agreed that the Defendant was "striking blows" to the victim's face and that she was aiming at her face.

Based upon this evidence, the jury convicted the Defendant of one count of aggravated assault with serious bodily injury, two counts of assault, and one count of unauthorized use of an automobile. The trial court ordered the Defendant to serve concurrent sentences of six years for the aggravated assault conviction, and eleven months and twenty-nine days for the remaining convictions in the Tennessee Department of Correction. It is from these judgments that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant claims that the evidence is insufficient to sustain her conviction for aggravated assault. The Defendant contends that there was insufficient proof of "serious bodily injury" because the victim did not suffer "extreme physical pain," "protracted unconsciousness," or "protracted or obvious disfigurement." The State responds that the evidence presented at trial was sufficient to sustain the Defendant's aggravated assault conviction, and that the circumstances of the assault support the jury's conclusion that the victim suffered seriously bodily injury. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978), superseded by statute on other grounds as stated in *State v. Barone*, 852 S.W.2d 216, 218 (Tenn.1993)) (quotations omitted). The Tennessee Supreme

Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *Smith*, 24 S.W.3d at 279). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

The Defendant was convicted of aggravated assault. Aggravated assault occurs when a defendant intentionally or knowingly commits an assault, as defined in Tennessee Code Annotated section 39-13-101, and, as charged in this case, the State must have proven beyond a reasonable doubt that the Defendant intentionally or knowingly caused serious bodily injury to the victim. T.C.A. §§ 39-13-101(a)(1), -102(a)(1)(A)(i) (2010). In this case, the State elected to prove "serious bodily injury" under the theories of "protracted unconsciousness," "extreme pain," and "obvious disfigurement." T.C.A. § 39-11-106(a)(34)(B), (C) and (D). We note that the statutory requirements are listed in the alternative, and thus, the State is required to prove only one of these theories beyond a reasonable doubt. *Id.*

In *State v. Farmer*, 380 S.W.3d 96 (Tenn. 2012), the Tennessee Supreme Court addressed the level of proof necessary to establish the element of "serious bodily injury" on the basis of "extreme physical pain[,]" stating:

> [I]n the instant case, the evidence does not support a finding that [the victim's] injury involved a degree of pain that would warrant its inclusion among the other enumerated portions of the definition of "serious bodily injury." Although [the victim] testified that he experienced pain after realizing he had been shot, hospital records do not classify his pain as "extreme" but rather as "mild" to "moderate." [The victim] was given a prescription for pain medication before leaving the hospital, but he never testified as to the degree

of pain he experienced. A jury could not reasonably infer from [the victim's] testimony, the hospital records, and the nature of his injury that [his] wound involved extreme pain.

*Id.* at 101-02 (footnote omitted) (citing T.C.A. § 39-11-106(a)(34)).

The Defendant cites *State v. Sims*, 909 S.W.2d 46 (Tenn. Crim. App. 1995), as an analogous case, for her contention that the victim's pain level was not "severe enough" to meet the statutory element of extreme physical pain enumerated in section 39-11-106(a)(34)(C). The *Sims* Court noted that pain is difficult to quantify or measure, *Id.* at 49, and as this Court has stated, "the subjective nature of pain is a question of fact to be determined by the trier of fact[.]" *State v. Eric A. Dedmon*, No. M2005-00762-CCA-R3-CD, 2006 WL 448653, at *5 (Tenn. Crim. App., at Nashville, Feb. 23, 2006), *no Tenn. R. App. P. 11 filed*.

In the present case, we conclude that the evidence, in the light most favorable to the State, proved that the victim suffered extreme physical pain constituting serious bodily injury. The evidence shows that the victim was beaten in the face, directly in the eye, repeatedly with a fist. The victim testified that she was also beaten in the face with a hard object other than a fist. Witnesses described the Defendant hitting the victim multiple times in the face. Unlike in *Farmer*, the victim in this case described her pain level and quantified it as level "ten" pain, stating that in the immediate aftermath of the assault, she could not walk without help. The victim also stated that she could not get out of her bed other than to use the restroom for a month because of the physical pain. Photographs of the victim showed her left eye swollen shut, and a police officer testified that the victim was unable to write her own account of what had happened, due to the injuries to her eyes. Several witnesses testified that the photographs accurately displayed the extent of her injuries, and the photographs show extensive injuries to the victim's eyes and face.

We reiterate that the subjective question of physical pain is left to the jury, and the evidence here in the photographs and the testimony is sufficient for the jury to conclude that the victim suffered extreme physical pain, and thus, sufficient to sustain the Defendant's conviction for aggravated assault. The Defendant is not entitled to relief as to this issue.

Our conclusion that the evidence was sufficient to support the jury's finding that the victim suffered "extreme pain" pursuant to Tennessee Code Annotated section 39-11-106(a)(34)(C) pretermits our consideration of the Defendant's arguments that the State failed to prove that the victim suffered from the alternative theories of "protracted unconsciousness" or "obvious disfigurement."

-13-

## III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the judgments of the trial court.

_____

ROBERT W. WEDEMEYER, JUDGE